Filed 5/15/24  P. v. Bernabe CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081983 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV21002862) |
| FELIPE BERNABE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael Knish, Judge.  Affirmed in part, vacated in part, and remanded for resentencing.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randall Einhorn, and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Felipe Bernabe was arrested after two different women accused him of raping, burning, and beating them and forcing them to orally copulate him. Both sexual assaults were alleged to have occurred in Rialto within six days of each other.

As to Jane Doe, the San Bernardino County District Attorney charged Bernabe with assault with intent to commit felony rape, sodomy, or forced oral copulation (Pen. Code[1], § 220, subd. (a)(1); count 1); assault with a deadly weapon (§ 245, subd. (a)(1); count 2); torture (§ 206; count 3); assault with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 4); forcible oral copulation (§ 287, subd. (c)(2)(A); count 5); and forcible rape (§ 261, subd. (a)(2); count 6). Attached to count 4 was an allegation he personally inflicted great bodily injury on Doe (§ 12022.7, subd. (a)) and to counts 5 and 6 an allegation of torture as to Doe. Bernabe was also similarly charged with multiple crimes stemming from the alleged attack of Jane Doe 2.

For his crimes against Doe, the jury convicted Bernabe of counts 1, and 3 through 6 and deadlocked on count 2. It found true the allegations of personal infliction of great bodily injury and torture on Doe. As to Doe 2, the jury deadlocked on all counts, and thus found not true the allegation of multiple victims (§ 667.61, subd. (a) and (e)). The trial court sentenced Bernabe to a total of six years plus 50 years to life in prison.

Bernabe asserts three contentions of error on appeal. First, he argues the trial court violated his state and federal due process rights by instructing the jury that it could consider the victims' level of certainty in weighing the

---

[1] Statutory references are to the Penal Code unless otherwise specified.

accuracy of their identification of him. Second, he contends the record lacks sufficient evidence of torture to support his conviction on count 3 and the special allegations of torture in counts 5 and 6. Finally, he asserts the court abused its sentencing discretion because it erroneously imposed a consecutive term on count 4 after confusing that count's factual basis with that of count 2, and otherwise failed to exercise its newly created sentencing discretion under section 654 as amended by Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518).

We agree with the Attorney General's concession that the trial court erred in sentencing Bernabe on count 4. We thus find it appropriate to vacate his sentence and remand for resentencing. We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Doe's Testimony*

On the evening of July 24, 2021, Doe was walking by a gas station in Rialto when she encountered Bernabe. She believed she had met him once before about a year earlier. They spoke and then walked toward his apartment.

Bernabe was nice but was "talking all kinds of weirdness." He then invited Doe into the garage adjacent to his apartment building. They entered through a pedestrian door, and then he put something in front of the door to block it. It was dark but they talked inside the garage for about half an hour. He did most of the talking and talked about "all kinds of crazy stuff."

Bernabe then punched Doe hard on the left side of her face with a closed fist and told her to orally copulate him. She complied because she was afraid. He told her to "[d]o it like you mean it" and punched her again. After

3

copulating him for about a minute, she became dehydrated and asked if she could get some water. He instructed her to take off her clothes and walk about 30 feet out from the garage door to get water from a hose. Although he stayed in the garage and it was dark, she did not run away at that point because she was naked. Instead, she returned to the garage, and Bernabe allowed her to get dressed.

Bernabe used a "torch" to light a drug pipe and offered Doe a hit, but she declined. After he took two hits, they left the garage and walked to his mother's car in front of the garage and got into the backseat. He resumed smoking his pipe. He then said something about "[b]itches like you," grabbed an iPad, and tried to hit Doe in the face with it. She blocked the blow but then he burned her on both of her upper arms using his torch and the mouth area of his drug pipe. She screamed and tried to get out of the car. In response, he punched her in the chest and closed the car door.

At that point, Bernabe told Doe to take her pants off and she complied, again, because she "didn't want him to harm [her]." He took his pants off and they had vaginal intercourse for three to five minutes even though she did not want to. When he finished, he said, "You're lucky you had sex with me." She slept in his car that night with Bernabe standing outside watching her the entire night. She did not report the assault.

On July 30, 2021, a law enforcement officer stopped Doe and her friend, Juan C., to ask Doe who gave her the bruises and burn marks that were still visible.[2] She told the officer how she got them and that a man named

---

[2]     She later testified Juan C. had hit her too but it was after the bruises from Bernabe had healed.

"Phillip" had caused her injuries.  She was reluctant to talk to the officer because she did not want to get Bernabe in trouble.

The officer recognized Doe's description of the perpetrator and location from the investigation of the attack on Doe 2 earlier in the same day.  When he showed Doe a satellite view of the house and garage on his phone, she said it was the correct location.  The officer told Doe to go to the hospital, which she did, but she left before being examined.

During a subsequent interview, Doe described the suspect as "Black, Puerto Rican, [or] Mexican with . . . light skin about 36 to 37 years old, 5' 3", 200 pounds with a stocky build."  The officer read her an admonishment about eyewitness identifications and gave her a stack of six photographs to review.  She looked at the first photograph, then turned to the second one and said, "Yeah.  Him."  The officer asked how positive she was about the identification, and she responded that she was 100 percent sure.  She did not want to look at any more of the photographs after choosing the second photograph.  The interview was video recorded, and the jury viewed it during trial.

At trial, the prosecutor asked Doe if she saw the man she met on July 24 in court.  Doe requested that Bernabe be directed to remove his mask (which he was wearing due to the COVID-19 pandemic).  When he did, she testified, "No.  That's not him."  Later, when asked to describe the person who attacked her, she said he was "Mexican" and "had braids."[3]

---

[3]    Outside the presence of the jury, defense counsel objected because Doe had not told police officers about the braids and it was not otherwise revealed in pretrial discovery.  She moved to exclude the six photographs the prosecution intended to rely on to help with Doe's identification on the grounds that it was unduly suggestive because five of the six men appeared to be Black, whereas only Bernabe was Hispanic and had braids.  The court

5

The prosecutor circled back to the identification question. Doe, who was crying, admitted she was nervous in court. The prosecutor asked again, "Do you remember the person who did this to you?" Doe responded, "Yes." But when the prosecutor followed up with, "Do you see the person in court who did this to you?" Doe responded, "No." As the reporter's transcript reflects, both counsel and the court were struggling to hear and understand Doe's testimony. For that reason, the court allowed the prosecutor to ask the question again. The prosecutor asked, "[D]o you remember who did this to you?" and Doe said, "Yes." In response to whether that person was in court, Doe testified, "Yes" again, pointed to Bernabe, and explained he was wearing white. She then confirmed that the photograph she selected previously was the person who attacked her and that she had been 100 percent sure of her identification at the time. The prosecutor requested that she look at the photograph in court and asked if she was "100 percent sure that the person in that picture is the person who did this to you?" Doe said, "Yes." When asked if anyone in the courtroom appeared to be the person in the photograph, she pointed to Bernabe.

The next trial day, Doe explained that Bernabe looked different in court than he had when he attacked her because he no longer had braids.[4] She also testified that it was hard to look at Bernabe "[b]ecause [of the] trauma to see somebody that did this to me" and explained that was part of the reason she had difficulty identifying him in court.

_____

eventually determined that the photographs were admissible. Bernabe does not challenge the court's evidentiary ruling on appeal.

[4] During cross-examination, defense counsel asked about Doe having testified that Bernabe was not the person who attacked her, and Doe said, "He looked different because he cut his hair."

6

## II.

### *Doe 2's Testimony*

The alleged attack on Doe 2 occurred six days after the attack on Doe, at around 11:00 a.m. on July 30, 2021, in a Rialto cemetery. Doe 2 testified that a man walked up to her and asked if she would go with him to visit his mother's grave. She agreed, and they walked across the cemetery and sat down. He pulled out a three- or four-inch long glass drug pipe with a bulb at the end and told her he wanted her to smoke it. When she said no, he burned her leg with the part of the pipe "that looks more like a stick" with a hole in it. He told her that if she did not "hit it" he would burn her face, so she took a hit.

The man then grabbed her by her hair, yanked her over to a locked gate, broke the gate open with a wrench-like tool, and shoved her into an adobe house located in the cemetery. She "tried everything [she] could to get out the door" and, in response, he beat her 12 to 15 times with a broom. She said she did not scream because he told her he would kill her if she screamed. Eventually, he knocked her to the floor, at which point he said he would stick the broom inside her if she did not stop.

She "laid possum" so he would think she was going to behave, but after he put the broom down, she tried to make it to the door. He grabbed her by the feet and yanked her back, and they wrestled on the floor for a bit. He then grabbed a "cylinder tool that had like spiky things coming from one side" and told her he would smash her face beyond recognition if she continued. At that point, she said she gave up fighting, and he raped her.

Specifically, she testified he grabbed her by the hair, put her face by his genital area, smacked her in the head when she did not do anything, and then put his penis in her mouth and told her to suck it. When he could not

achieve an erection, he held her down by her neck, ripped her pants off, and then got behind her and performed oral sex on her. When he stopped, she tried to get away, but he grabbed her, flung her to the ground, and then straddled her and took off her shirt and bra. He started kissing, licking, and biting her body, and then told her to give him a hickey, which she did. He then inserted his penis in her vagina without her consent.

Afterward, she was crying, and he let her get up and start to get dressed. After unsuccessfully trying to escape again, he finally let her leave after she lied and told him she would meet him in the same spot at the same time the next day. Doe 2 walked to a nearby park, called her husband, and then called 911. Police arrived and questioned her, and then took her to a hospital where a nurse completed a sexual assault kit.

Doe 2 described her assailant as "probably 5' 8" to 5' 10" " and Hispanic, with "tattoos on his forearms" and a tattoo across his chest. She also said he wore a hat and black pants and had "a black belt with a silver 'MK' written on it." An officer then showed her about 10 photographs. She identified one as being the individual who attacked her and said she "was like 100 percent" confident it was the person.[5]

At trial, Doe 2 identified photographs of her attacker based on his "MK" belt buckle and several tattoos. The prosecutor entered in evidence many photographs of Bernabe's tattoos and the location of the alleged crime, in addition to testimony from the nurse who conducted the rape examination. But when asked if she saw the man from the cemetery in court, Doe 2 said "No." After reviewing photographs that included the belt buckle and tattoos,

---

[5]    The prosecutor did not obtain testimony from the officer who prepared the stacks of photographs to confirm that the photograph the victims identified was, in fact, Bernabe.

the prosecutor asked again if she saw the individual in court. Over defense counsel's objection, the court asked if her answer had changed, and Doe 2 responded, "No."

DISCUSSION

I.

*Witness Certainty Instruction Under CALCRIM No. 315*

Bernabe argues that instructing the jury with CALCRIM No. 315, which allows for consideration of eyewitness certainty, violated his state and federal due process rights. For reasons we explain, we reject his claim of instructional error.

We review claims of instructional error de novo. (*People v. Thomas* (2023) 14 Cal.5th 327, 382; *People v. Marquez* (2023) 89 Cal.App.5th 1212, 1218.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*).) We also presume jurors understand and follow the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

During an initial discussion about jury instructions after the People rested their case, the court asked defense counsel if she planned to request the eyewitness instruction, and she said yes. She also confirmed that she would not be presenting expert evidence on eyewitnesses. Later, as they were discussing instructions, the court said, "Eyewitness identification I put that in exactly as it is. I didn't modify it." Defense counsel did not object.

At the close of evidence, the court instructed the jury pursuant to CALCRIM No. 315 that it could consider 14 factors when evaluating

9

eyewitness identification testimony. Relevant here, the court instructed the jury as follows: "You have heard eyewitness testimony identifying the Defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] . . . [¶] How certain was the witness when he or she made an identification?"

Our Supreme Court recently evaluated CALCRIM No. 315 in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). The *Lemcke* court expressed concern that the factor allowing jurors to consider the eyewitness's level of certainty reinforced a common misconception that an "identification is more likely to be reliable when the witness has expressed certainty." (*Id.* at p. 647.) Consequently, the court concluded that a "reevaluation of the certainty instruction [in CALCRIM No. 315] is warranted," citing to the "near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' " (*Ibid.*) The court referred the matter to the Judicial Council and its Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Ibid.*) Until such an evaluation could be completed, the Supreme Court directed trial courts to "omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id.* at pp. 647–648.)

Nonetheless, the trial court here instructed the jury with CALCRIM No. 315, even though Bernabe's trial occurred roughly eight months after the

10

*Lemke* decision and before the Judicial Council had completed its evaluation.[6]

In addressing the merits of Bernabe's claim, we begin with the framework for evaluating a due process challenge to any jury instruction. As the *Lemcke* court explained, "The touchstone of due process is fundamental fairness. A jury instruction may so infuse the trial with unfairness as to deny due process of law." (*Lemcke, supra,* 11 Cal.5th at p. 655 [cleaned up].) But a due process violation does not result every time a trial court gives an instruction that is ambiguous, inconsistent, or deficient in some respect. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906.) Rather, "the question is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process." (*People v. Mills* (2012) 55 Cal.4th 663, 677

---

[6]     Although Bernabe's counsel requested the eyewitness instruction, there was no discussion in the record of the certainty factor or the *Lemcke* directive. Thus, it does not appear the trial court intended to omit the certainty factor from CALCRIM No. 315 and only included it at Bernabe's request. (See *Lemcke, supra*, 11 Cal.5th at pp. 647–648.) Bernabe's counsel also did not object to CALCRIM No. 315 at trial. For this reason, the People argue Bernabe forfeited this contention on appeal. Although Bernabe concedes he did not object, he contends we should exercise our discretion under section 1259 to address his claim on the merits because the issue affects his substantial rights.

We decline to find a forfeiture for the following reasons: (1) we question whether counsel was required to object when the trial court already had a sua sponte duty to omit the certainty factor from the instruction (see e.g. *People v. Tapia* (1994) 25 Cal.App.4th 984, 1030–1031 [finding no invited error because "the court's duty to apply the correct law is not dependent upon counsel and is not waived by counsel's failure to object to the error"]); (2) to address whether Bernabe's substantial rights were affected, we necessarily must determine the merits of his claim anyway; and (3) even if Bernabe arguably forfeited his claim, on these facts, we would elect to exercise our discretion to reach the merits.

[cleaned up], quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) "It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." (*Lemcke,* at p. 655 [cleaned up].)

In *Lemcke,* our high court held that giving the eyewitness certainty instruction did not always render a defendant's trial fundamentally unfair or otherwise deprive a defendant of due process. (*Lemcke, supra*, 11 Cal.5th at p. 661.) To the contrary, the court noted that nothing in the instruction operated to " 'lower the prosecution's burden of proof' " or "direct the jury that 'certainty equals accuracy.' " (*Id*. at p. 657.) The certainty factor was simply one of several other factors for evaluating the credibility of witness identification. (*Ibid*.) The jury instruction left for the jury to determine "whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Ibid*.) Because defense counsel in that case was able to cross-examine both the victim and the investigating officers regarding problematic aspects of the identification process as well as call an eyewitness identification expert, the *Lemcke* court concluded that "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id*. at pp. 660–661.)

Bernabe argues such moderating factors were absent in his trial. The defense did not present expert testimony about the accuracy of eyewitness testimony and thus, in Bernabe's view, the jury was effectively told it could

12

consider witness certainty as a reflection of witness accuracy. He further highlights that the prosecutor told the jury three times in closing argument that Doe "was a hundred percent certain" in her identification. Although defense counsel did have an opportunity to cross-examine Doe, Bernabe argues she did not address Doe's claimed certainty and that her cross-examination was rendered ineffective by Doe's "uncooperative, combative and non-linear" manner of testifying.[7] Bernabe further contends the standard instructions that the jury must follow the law and find him guilty beyond a reasonable doubt did nothing to mitigate the effect of the eyewitness certainty instruction. Ultimately, Bernabe contends reliance on this factor violated due process because it precluded the jury's effective consideration of Bernabe's defense that he was not the perpetrator of the rape. We are not persuaded.

Considering the eyewitness certainty instruction within the context of the trial record as a whole, we do not find it reasonably likely the jury equated Doe's certainty during the photographic identification with accuracy and discounted defense evidence and other factors supporting a reasonable doubt as a result. (See *Lemcke, supra,* 11 Cal.5th at p. 660 [rejecting the defendant's due process claim that giving the certainty instruction denied him the opportunity to present a complete defense on the issue of identity].) While the prosecutor did seize upon the fact that Doe was 100 percent certain of her identification in the photographic identification, the jurors watched the video recording of the identification process and could therefore assess for themselves Doe's demeanor and level of attention when she picked Bernabe's

---

[7]     Because we conclude that Bernabe suffered no prejudice from the purported instructional error, we need not address his claim of ineffective assistance of counsel.

13

photograph. Thus, the jurors were not left to presume her identification was accurate because she expressed certainty but could, as CALCRIM No. 315 directed, "decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke,* at p. 657.) Doe's identification was also supported by her prior verbal description of her attacker before viewing any photographs.

The fact that the jury could not reach a verdict on the counts involving Doe 2, in our view, also demonstrates the jury did not disproportionately rely upon eyewitness certainty and instead held the prosecution to its burden of proof. Like Doe, Doe 2 identified Bernabe's photograph "immediately without [a] doubt." Nonetheless, the jury did not convict Bernabe of any counts involving Doe 2, suggesting the eyewitness certainty instruction did not cause this jury to override its concerns regarding other evidence in the case or effectively lower the prosecutions' burden of proof. As in *Lemcke, supra,* 11 Cal.5th at page 658, this jury was properly instructed on the prosecution's burden of proof, having been told that a defendant is presumed innocent, that the People must prove guilt beyond a reasonable doubt, and that they could only rely on evidence, not attorney argument.

The jury also received other instructions about witness testimony, which reinforced CALCRIM No. 315's directive they carefully assess and weigh witness evidence. In particular, the jury was instructed that, "[p]eople sometimes honestly forget things or make mistakes about what they remember," and that they as jurors were charged with "judg[ing] the credibility or believability of the witnesses." That the jury did not convict on the Doe 2 counts strongly suggests it followed these instructions with regard to both victims and properly weighed Doe's certainty against other relevant

14

factors from CALCRIM No. 315 and additional evidence supporting the defense.

Moreover, during her closing argument, defense counsel emphasized evidence that provided grounds for doubting Doe's identification. First, she highlighted problematic aspects of the identification procedure, including that the lineup only contained one photograph of a Hispanic male and that he was also the only one with braids. She further pointed out that Doe did not know on what day the rape occurred, was confused during her testimony, frequently changed her story, and professed having a problem with alcohol. Finally, defense counsel reminded the jury that Doe repeatedly failed to identify Bernabe in court. As the *Lemcke* court noted, "[t]he misleading effect we are concerned with here—that the jury is prompted to believe there is a strong correlation between certainty and accuracy despite empirical research showing just the opposite—is not present when a witness has expressed doubt regarding the identification." (*Lemcke, supra,* 11 Cal.5th at p. 669, fn. 19.) On this record, we do not believe it is reasonably likely the jury applied the instruction in an impermissible manner. (*Houston, supra,* 54 Cal.4th at p. 1229.)

However, even assuming the trial court erred by not omitting the eyewitness certainty instruction as *Lemcke* directed, reversal is not warranted unless the error was prejudicial. (See *People v. Hendrix* (2022) 13 Cal.5th 933, 941.) Bernabe urges us to apply the standard of review applicable to federal constitutional errors under *Chapman v. California* (1967) 386 U.S. 18 to his claim of instructional error, but he maintains that he was prejudiced under either the *Chapman* standard, or the standard applicable to questions of state-law error under *People v. Watson* (1956) 46 Cal.2d 818, 836. Because our Supreme Court has repeatedly applied the

15

*Watson* standard to claims of instructional errors involving the certainty factor (see e.g. *People v. Sanchez* (2016) 63 Cal.4th 411, 463 (*Sanchez*); *People v. Ward* (2005) 36 Cal.4th 186, 214), we do the same.

Based on our review of the entire record, we conclude it is not reasonably probable Bernabe would have achieved a more favorable result at trial absent the claimed error. (*Sanchez, supra,* 63 Cal.4th at p. 463.) Other evidence in the record besides her certainty supports Doe's identification of Bernabe. For instance, one factor under CALCRIM No. 315 expressly allows consideration of whether the witness knew or had prior contact with the defendant, and Doe testified that she met Bernabe a year before the assault. The jury also heard evidence addressing the CALCRIM No. 315 factor asking, "How well could the witness see the perpetrator?" Doe had time to observe Bernabe when she walked with him before entering the garage and then when they spoke for about half an hour before the attack occurred. As the People point out, because the nature of the crimes required Doe and Bernabe to be in close proximity to one another, Doe had additional opportunities to look at Bernabe during the rape, torture, and oral copulation. And while this evidence was moderated by the fact that Doe said it was dark outside and in the garage, she did spend a prolonged period of time with him. Doe also provided a description of her attacker's height, build, and potential race *before* she identified him from the photographs, and this also may be considered as a factor. Finally, Doe identified Bernabe in court and confirmed that he was the individual in the photograph she chose out of the lineup. These facts all provide independent support for her identification and the jury's verdicts.

## II.

### *Sufficiency of the Evidence of Torture*

Bernabe contends substantial evidence does not support the jury's finding that he had the intent necessary to sustain his torture conviction in count 3 and the special allegations of torture in counts 5 and 6. He further argues there was insufficient evidence showing Doe's injuries were of the nature and severity required for a torture conviction. We disagree.

In considering a challenge to the sufficiency of the evidence, "we must examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding the defendant guilty beyond a reasonable doubt." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658 (*San Nicolas*) [cleaned up].) We do not substitute our own factual determinations for the factfinder's (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078) as " '[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact' " (*People v. Brown* (2014) 59 Cal.4th 86, 106 (*Brown*)).

"The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. The same standard applies when the conviction rests primarily on circumstantial evidence. Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably

17

be reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054 [cleaned up].)

The jury convicted Bernabe under section 206, which provides that "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture." (§ 206.) "The crime of torture does not require any proof that the victim suffered pain." (*Ibid.*) Great bodily injury is defined as "a significant or substantial physical injury." (§ 12022.7, subd. (f).)

The torture special allegation in section 667.61, subdivision (d)(3), is based on the definition of torture in section 206. (§ 667.61, subd. (d)(3).) Thus, our analysis of the sufficiency of the evidence is the same for both statutes.

In Bernabe's view, the evidence of the nature and severity of Doe's burns and bruises was insufficient to establish great bodily injury. He argues Doe never had a medical examination and that there was no medical testimony or evidence about the nature of her injuries, the seriousness (that is, the degree) of her burns, or whether any of her injuries impacted her ability to use her arms in any way. According to Bernabe, the photographs depict burns the size of a nickel or quarter that do not seem to be deep wounds. He points out that Doe did not even testify that she was sore or in pain. Although he acknowledges that burns and bruises can constitute great bodily injury in some circumstances, Bernabe argues the injuries here hardly constitute the "extremely violent and callous criminal conduct" (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1573) that the torture statute is intended to punish.

There is no question that "[p]roof that a victim's bodily injury is 'great'—that is, significant or substantial within the meaning of section 12022.7—is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*People v. Cross* (2008) 45 Cal.4th 58, 66 (*Cross*).) As Bernabe correctly states, Doe did not obtain medical care and the prosecution did not present a medical expert to establish the severity of her injuries. However, there was evidence in the record as to Doe's pain and the severity of her injury because Doe testified that she screamed when Bernabe inflicted the burns, and she showed the jury that scars from the burns remained on her arms many months later.

Medical evidence is also not the exclusive means for establishing that an injury is "great." The evidence can support a great bodily injury finding when the injury could be described as "gratuitous" and "over and above that necessarily present in the commission of the offenses themselves." (*People v. Escobar* (1992) 3 Cal.4th 740, 746 (*Escobar*); *Cross, supra*, 45 Cal.4th at p. 66 [confirming the continuing applicability of the *Escobar* conclusion].)

In *Escobar*, the defendant accosted the victim at a bus stop and forced her at gunpoint into a vehicle. (*Escobar, supra,* 3 Cal.4th at p. 743.) After driving for some time, the victim screamed when she saw a police car and attempted to escape. (*Ibid.*) The defendant pulled her back by her hair and squeezed her neck. (*Ibid.*) He later stopped, and she attempted to run away, but he grabbed her hair and blouse, slapped her, and then threw her into the car. (*Id.* at p. 744.) When the defendant finally parked, he dragged her to another location, pulling her by the hair at some points, then threw her onto the cement ground and struck her head against the pavement before raping her. (*Ibid.*)

19

The defendant was found guilty of having kidnaped, raped, and assaulted the victim with a deadly weapon. (*Escobar, supra,* 3 Cal.4th at p. 745.) In evaluating whether there was sufficient evidence to support a great bodily injury enhancement, the court noted that section 12022.7 "contains no specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*Id.* at p. 750.) To the contrary, the court concluded that "nothing in the statutory definition precludes a jury from finding great bodily injury based on precisely the quantum of evidence presented here: extensive bruises and abrasions over the victim's legs, knees and elbows, injury to her neck and soreness in her vaginal area of such severity that it significantly impaired her ability to walk." (*Ibid.*) The court specifically noted that these "are not the type of injuries 'routinely associated with rape,' but reflect a degree of brutality and violence substantially beyond that necessarily present in the offense." (*Ibid.*)

The same could be said of Doe's injuries. Burns from a torch and a drug pipe are not "routinely associated with rape." Punches resulting in bruises to the face and chest are not elements of forcible copulation or required for that crime. The jury could fairly conclude these injuries were gratuitous. And although the *Escobar* court made clear that prolonged disfigurement is not required, burn marks that remained visible five months later certainly would meet this standard.

Our Supreme Court "has long held that determining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury. A fine line can divide an injury from being significant or substantial from an injury

20

that does not quite meet the description.  Where to draw that line is for the jury to decide." (*Cross, supra,* 45 Cal.4th at p. 64 [cleaned up].)

Here, Doe displayed her burn scars to the jury and the prosecution provided photographs of the burns and bruises from nearly a week after the incident.  Doe described how hard the punches were and how she screamed when Bernabe burned her.  Although these injuries may fall closer to the line than some, other courts have found great bodily injury on a comparable factual record.  (See e.g. *People v. Wallace* (1993) 14 Cal.App.4th 651, 665–666 [victim's wrists were burned from flex-ties and were bandaged for two days, and she experienced a severe burning sensation for 24 hours from having an insecticide-like substance sprayed in her eyes, vagina, and anus]; *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836 [child victim suffered multiple contusions over various portions of her body that were swollen, discolored, and appeared painful to the touch].)  And while "there is no question there are cases in which the acts of torture were more gruesome, when we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Odom* (2016) 244 Cal.App.4th 237, 248 [cleaned up], quoting *People v. Thomas* (1992) 2 Cal.4th 489, 516.)  We therefore conclude that credible evidence of sufficient great bodily injury supported the jury's torture finding. (See *San Nicolas, supra,* 34 Cal.4th at pp. 657–658.)

Bernabe next challenges the sufficiency of the evidence of his intent to torture Doe.  As previously noted, the statute requires "the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.)  "[I]t is the state of mind of the torturer—the cold-blooded intent to inflict pain for personal gain or satisfaction—which society condemns." (*People v. Steger* (1976) 16 Cal.3d

21

539, 546 (*Steger*) [discussing torture within the context of a torture murder pursuant to § 189].)  As the statute makes clear, that personal gain may be revenge, extortion, or persuasion, while satisfaction may come from pursuing any other sadistic purpose.  (§ 206.)

Our Supreme Court has clarified that there is no legal definition of "sadistic purpose."  (*People v. Raley* (1992) 2 Cal.4th 870, 901 (*Raley*).)  The court noted, "The term 'sadism' is defined as 'love of cruelty, conceived as a manifestation of sexual desire' (Webster's New Internat. Dict. (2d ed. 1941) p. 2196), as 'the infliction of pain upon a love object as a means of obtaining sexual release' (Webster's Third New Internat. Dict. (1981) p. 1997), as 'the getting of sexual pleasure from dominating, mistreating, or hurting one's partner' (Webster's New World Dict. (2d college ed. 1974) p. 1253), and as 'sexual gratification gained by causing pain or degradation to others.' (Webster's College Dict. (1991) p. 1182)."  (*Raley,* at p. 900.)  Fundamentally, the court explained that "[i]t is a term in common usage, having a relatively precise meaning, that is, the infliction of pain on another person for the purpose of experiencing pleasure."  (*Id.* at p. 901; accord *People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1203 (*Aguilar*).)

"Unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses)," the defendant's state of mind "must be proved by the circumstances surrounding the commission of the offense, which include the nature and severity of the victim's wounds."  (*People v. Tran* (2022) 13 Cal.5th 1169, 1202–1203 [cleaned up].)  That being said, our high court has also " 'cautioned against giving undue weight to the severity of the wounds' " explaining that "severe injuries may also be consistent with the desire to kill,

22

the heat of passion, or an explosion of violence." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137.)

On the record before us, the trier of fact could reasonably conclude that Bernabe punched and burned Doe for his own personal gain and satisfaction. The *Steger* court cited examples where a defendant harmed his victim for a very specific purpose, and we conclude the jury could reasonably have found the same true here. For example, in *People v. Daugherty* (1953) 40 Cal.2d 876, 886–887, a defendant stabbed his wife several times, struck and kicked her, and dragged her through the dirt to make her suffer for her alleged infidelity. (*Steger, supra,* 16 Cal.3d at p. 547.) In *People v. Turville* (1959) 51 Cal.2d 620, the defendants repeatedly hit and kicked a victim to persuade him to open his safe. (*Steger,* at p. 547.) More recently, an appellate court found substantial evidence supporting a torture conviction where it appeared the defendant attacked and disfigured his girlfriend as revenge for asking him to move out and for allegedly cheating on him. (*People v. Burton* (2006) 143 Cal.App.4th 447, 453.)

Similarly, as Bernabe acknowledges, he first punched Doe to persuade her to orally copulate him. When her performance apparently was not satisfactory, he punched her again while instructing her to "Do it like you mean it." The jury could reasonably conclude he later punched her in the chest as revenge for screaming and attempting to exit his vehicle. It also could fairly construe the chest punch as an effort to extort her compliance with his next order, which was to take off her pants and submit to vaginal rape. The evidence shows it had this effect, as Doe testified that she took off her own pants because she "didn't want him to harm [her]."

Although Doe did not elaborate as to the circumstances of the burns, we conclude the description she did provide, coupled with the timing,

23

supports a reasonable inference that he inflicted them for a sadistic or extortionary purpose. The evidence shows Doe went to the car with Bernabe and sat there while he smoked his pipe. There is no evidence he was angry or that she provoked him in any way. Nonetheless, he suddenly attempted to hit her with an iPad, and then burned her on both arms. The senselessness of burning her under these circumstances could lead the jury to reasonably conclude that dominating, mistreating, and hurting Doe gave Bernabe sexual pleasure. (*Raley, supra,* 2 Cal.4th at pp. 900–901.) And because these actions, like the blows, also had the effect of instilling fear in Doe and obtaining compliance with his order to remove her pants so he could rape her, the evidence also supports the inference of an extortionary or persuasive purpose.

Support for both inferences is bolstered by the fact that Bernabe kept Doe in his custody for a prolonged period of time after seeing the impact his inflictions of cruel pain had on her level of terror and compliance. The three punches and the two burns were separated in time and constituted at least four discrete events. Although the "intent to inflict *prolonged* pain is not an element of the crime of torture" (*Aguilar, supra,* 58 Cal.App.4th at p. 1205), the fact that an attack went on "for a significant period of time and involved different episodes with breaks during which defendant had ample time to reflect upon his conduct but nevertheless returned to the attack" is relevant to show the defendant's state of mind (*People v. Massie* (2006) 142 Cal.App.4th 365, 372–373). Bernabe certainly had time to release Doe or cease inflicting cruel pain upon her for his own benefit—particularly during the break between the attacks in the garage and those in the car. He did not.

Substantial evidence also supports the jury's conclusion that these actions demonstrated the requisite "intent to cause cruel or extreme pain and

24

suffering." (§ 206.) Doe described the punches as hard, as causing her to scream, and as resulting in bruises that lasted at least six days. More significantly, a jury could fairly conclude that his intentional burning of her skin was intended to cause extreme pain. These were not passing glances with the torch and pipe, but rather exposure times that were prolonged enough to result in scars that persisted for over five months. Under these circumstances, the jury could infer an intent to inflict cruel pain.

Bernabe nonetheless argues this was a brief explosion of violence or that he could also have just been flailing around in the car with the torch and pipe. The record does not support this conclusion. As previously noted, there is no evidence Bernabe was particularly provoked or that he lashed out in rage and then stopped. Rather, he doled out hard punches and burns over an extended period. Although he was using drugs and may have been impaired, the evidence also does not show he was randomly flailing in the car. Bernabe made a comment about "[b]itches like you" before picking up the iPad and trying to hit Doe in the face with it. When she blocked the blow, he used either the torch or the pipe (it is not clear which burn he inflicted first) and burned her on one arm. He then switched to the other device and burned her on the other arm. It is unlikely that he could have accidentally lit the torch and also presumably reached across to the arm farther away from him all while randomly flailing. Moreover, his comment suggesting he thought little of "bitches" like Doe supported an inference of intentional infliction of pain. And again, although Bernabe attempts to downplay the pain, a jury could reasonably conclude that burning someone with a lit torch showed an intent to inflict extreme or cruel pain.

Furthermore, to the extent Bernabe suggests other possible scenarios such as that he was in a "drug-induced psychotic state," he asks us to reweigh

the evidence and make different inferences. This is not our role in a substantial evidence review. (*Brown*, *supra*, 59 Cal.4th at p. 106.) Thus, we conclude substantial evidence supported Bernabe's conviction for torture. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331) [explaining that reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]' "].)

## III.

*Sentencing Discretion Under Section 654*

Bernabe's final contention is that the trial court failed to exercise the sentencing discretion newly afforded to it under Assembly Bill 518.[8] He also asserts that the court confused the factual basis of count 2 with that of count 4 and, as a result, improperly imposed a consecutive sentence on count 4. The People concede the factual error as to count 4 and assert that the

---

[8] Before its amendment by Assembly Bill 518, section 654 provided in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).) Assembly Bill 518 amended section 654 to provide in part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "Previously, where section 654 applied, the sentencing court was required to impose the sentence that provides for the longest potential term of imprisonment and stay execution of the other term. (§ 654, former subd. (a).) As amended by Assembly Bill 518, section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 [cleaned up].)

sentence should have been stayed pursuant to section 654, but otherwise argue there is no evidence the court was unaware of its sentencing discretion.

We review discretionary sentencing decisions for abuse of discretion and " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.' " (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)

In this case, the trial court sentenced Bernabe pursuant to section 667.61, subdivisions (a) and (d), to two consecutive terms of 25 years to life on counts 5 and 6, finding them to be "separate, distinct acts and in separate places" that took place "over an extended period of time." On count 4, the court sentenced Bernabe to six years, which was based on the middle term of three years plus an additional three years for personally inflicting great bodily injury pursuant to section 12022.7, subdivision (a). It ran this term consecutively, finding it was "a separate assault with an iPad." Finally, the court imposed a six year term for count 1 and a life term on count 3 but stayed these sentences pursuant to section 654 because count 1 was part of the same conduct as the other counts and count 3 was "subsumed under the [section] 667.61(a) and (d)."

As the People properly concede, the trial court erred in sentencing Bernabe on count 4. Count 2 for assault with a deadly weapon (§ 245, subd. (a)(1)) was the charge based upon Bernabe's attempt to strike Doe with the iPad, but the jury deadlocked on that count. According to the prosecution's closing argument, the charge of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)) in count 4 addressed Doe's "[b]urns, beat[ing], and bruises." Thus, the court confused the factual basis for the two in imposing a consecutive sentence on count 4 based upon "a separate assault with an iPad."

27

The People contend the appropriate remedy is to reverse the consecutive term imposed for count 4 and stay the punishment for that count. They reason that the acts comprising the assault in count 4—the burns, beating, and bruising—were the same acts supporting the torture conviction in count 3, as well as the torture allegations in counts 5 and 6. Because section 654 prohibits punishment for two crimes arising from a single act or indivisible course of conduct, Bernabe may not be punished for both. (§ 654.) The People therefore would have us stay count 4.

We conclude we must remand for a full resentencing. The trial court never considered the actual factual basis underlying count 4 and never exercised its discretion to impose a sentence on that count. "Defendants are entitled to sentencing decisions made in the exercise of the informed discretion of the sentencing court" which is not present when the "sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [cleaned up].) Here, the trial court imposed a sentence on count 4 based upon a material mistake of fact and, thus we cannot say it exercised informed discretion in imposing a sentence. Although we could have simply imposed and stayed a sentence on count 4 under the previous version of section 654, the trial court has greater discretion under the current version to choose which sentences to impose and stay. Accordingly, where, as here, the factual circumstances upon which the sentence will be based are altered from the trial court's original understanding, "a remand for a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances." (*People v. Navarro* (2007) 40 Cal.4th 668, 681.)

Because the trial court will be able to exercise its discretion in accordance with the current version of section 654 on remand, we need not address Bernabe's other contention that the court was unaware of the scope of its sentencing discretion following passage of Assembly Bill 518.

## DISPOSITION

Bernabe's sentence is vacated, and the matter is remanded for a full resentencing consistent with this opinion. In all other respects, the judgment is affirmed.

DO, J.

WE CONCUR:

IRION, Acting P. J.

CASTILLO, J.

29